UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

A.E.S. (XXX-XX-1765)               CIVIL ACTION NO. 18-cv-0810

VERSUS                              JUDGE FOOTE

SOCIAL SECURITY ADMINISTRATION      MAGISTRATE JUDGE HORNSBY

**REPORT AND RECOMMENDATION**

**Introduction**

A.E.S. ("Plaintiff") was born in 1997. He completed the 10th grade but was unable to obtain a GED. Despite attempts to work, he has never had gainful employment. He filed for Supplemental Security Income due to his bipolar disorder, attention deficit hyperactivity disorder ("ADHD"), and degenerative disc disease.

ALJ Mary Abbondondelo held an evidentiary hearing and issued a written decision in which she found that Plaintiff was not disabled. The Appeals Council denied a request for review, which made the ALJ's opinion the Commissioner's final decision. Plaintiff filed this civil action to seek the limited judicial relief that is available under 42 USC § 405(g). For the reasons that follow, it is recommended that the Commissioner's decision be reversed and remanded for further proceedings.

**Summary of the ALJ's Decision**

The ALJ analyzed the claim pursuant to the five-step sequential analysis established in the regulations. Tr. 63-73. See Perez v. Barnhart, 415 F.3d 457, 461 (5th Cir. 2005). At step one, she found that Plaintiff had not engaged in substantial gainful activity since the

date of his application for benefits. At step two, she found that Plaintiff had bipolar disorder, ADHD, and degenerative disc disease lumbar spine, impairments that are severe within the meaning of the regulations, but not so limiting as to meet or equal a listed impairment at step three that would require a finding of disability without consideration of other factors.

Before going from step three to step four, the ALJ must assesses a claimant's residual functional capacity ("RFC"), which is the most the claimant can still do despite his limitations. The claimant's RFC is used at steps four and five to determine if the claimant can still do past relevant work or adjust to other jobs that exist in the national economy. The ALJ found that Plaintiff had the RFC to perform light work, except that he could have only occasional contact with supervisors, coworkers, and the public, and he was limited to Specific Vocational Preparation ("SVP") level 2 work.[1]

Plaintiff did not have any past relevant work, so the ALJ found in his favor at step four. Step five asks whether the claimant, considering his age, education, work experience, and RFC, can perform the demands of other jobs that exist in significant numbers in the

---

[1] SVP is defined in Appendix C of the Dictionary of Occupational Titles. It is "the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation." An SVP 1 job requires a "[s]hort demonstration only." An SVP2 job typically has a learning period of "[a]nything beyond short demonstration up to and including 1 month." Both categories are considered unskilled work. Social Security Ruling 00-4p; 20 C.F.R. § 416.968 ("Unskilled work is work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time.")

economy. A vocational expert testified that a person with Plaintiff's RFC and other factors could perform the demands of price marker and cafeteria attendant, both of which are light jobs rated SVP 2. The ALJ accepted that testimony and found at step five that Plaintiff was not disabled within the meaning of the law.

**Issues on Appeal**

Plaintiff's brief identifies three issues for appeal:

1. The ALJ erred in giving little weight to the opinion of the treating psychologist, Dr. George S. Park, PhD.

2. The ALJ erred in giving great weight to the opinion of the examining psychological source, Dr. Krenek, PhD.

3. The ALJ erred in applying the wrong standard in evaluating Plaintiff's statements concerning the intensity, persistence, and limiting effects of his symptoms.

**Standard of Review; Substantial Evidence**

This court's review of the Commissioner's decision is limited to two inquiries: (1) whether the decision is supported by substantial evidence on the record as a whole, and (2) whether the Commissioner applied the proper legal standard. Perez, 415 F.3d at 461. "Substantial evidence is more than a scintilla and less than a preponderance." Masterson v. Barnhart, 309 F.3d 267, 272 (5th Cir. 2002). It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Greenspan v. Shalala, 38 F.3d 232, 236 (5th Cir. 1994). A finding of no substantial evidence is justified only if there are no credible evidentiary choices or medical findings which support the ALJ's determination. Johnson v. Bowen, 864 F.2d 340, 343-44 (5th Cir. 1988).

**Relevant Evidence**

    **A. Hearing Testimony**

Plaintiff testified at a hearing in February 2017. He was accompanied by an attorney. He testified that he was 19 years old, lived in a mobile home with his girlfriend, and was not working. He had attempted to work several jobs, but none of them amounted to much or produced much income. Some of his job attempts included a half-day high school program where he worked for a small engine shop, making repairs on his own, and working in a body shop. Tr. 83. He once had a truck, but he wrecked it within the first week of ownership. Tr. 84.

Plaintiff testified that he had to repeat kindergarten, and he was in special education classes in school. He was unable to "make it through" the mainstream classes that he took. The highest grade he completed was the 10th, and he received a certificate of completion. Tr. 84.

Plaintiff's physical limitations are not at issue on this appeal, but Plaintiff testified that he has pain and discomfort in his joints. He said that the pain made it difficult for him to move or to stay in one place. For example, his shoulder gets dislocated simply by reaching out, and his and elbows are similarly affected. He also has pinched nerves and herniated discs in his back. Tr. 85. Plaintiff stated that he has irritable bowel syndrome ("IBS"), which consists of episodes that last anywhere from an hour to a week. His last episode was the day before the hearing. Tr. 85-86. Because of these impairments, Plaintiff is only able to lift about 15 pounds. Tr. 91. He can sit for about 45 minutes at a time and can only walk 400 or 500 feet before he has to sit and rest. Tr. 91.

Plaintiff sees Dr. George Park for treatment of his bipolar disorder, anxiety, and depression. Tr. 86. He stated that he has periods of not being able to get along with people. When asked to describe those periods, he stated:

> "Oh, I just get really upset and I don't know why and it's, it's just nothing -- and just small things just irritate me and then I get really over-irritated and it just keeps going and I don't -- and I just get mad and then I act a fool and then afterwards I don't even know why I was mad or upset." Tr. 86-87.

Plaintiff testified that these episodes can get physical. On one occasion, his grandmother was on his truck, and he shook the truck, causing her to fall. On another occasion, he pushed his mother off the porch, which was about six feet off the ground. Tr. 87-88. He said that the things that set him off can be very minor, and he gets frustrated very easily. Tr. 88.

Plaintiff passes the time by helping feed horses. He also works on repairing things, such as weed-eaters and chainsaws. He says that he has to stop working a lot because he gets frustrated. When this happens, he throws tools or parts around the shop. 88-89. He testified that he has a hard time completing projects or tasks, and that he gets very easily distracted. He stated:

> ". . . I can just start on it and then I get upset or I get on another task, like I was supposed to do laundry or come eat lunch and then I end up doing something else between there and then I never come back to it and that I just (get) off focus." Tr. 90.

Plaintiff's maternal grandmother, Mary Wiggins-Jennings, also testified at the hearing. Mary stated that Plaintiff's mobile home is located on her property, so she sees him every day. Tr. 91-92. She stated that Plaintiff always had problems in school with

Page 5 of 16

interpersonal relationships. His mother is a teacher, and she would try to teach him at night. But by morning, "he couldn't remember any of it." Tr. 92.

Mary testified that the yard around Plaintiff's house looks "like a junkyard because he'll start something and leave it and go to something and leave it and stuff is all over the yard." Tr. 92. She said that he gets angry very easily, and she can never tell what is going to set him off. She said that she cannot talk to him when he is mad, and that she has to "get away from the situation and let him calm down and then in maybe an hour or two he'll come and say I'm sorry I acted like that." Tr. 93.

Mary testified that Plaintiff has, at times, been noncompliant with his medication because he never remembers to take it on his own. His family has always had to administer his medicine to him. His girlfriend has been giving him his medicine every day, but sometimes she also forgets. Tr. 93-94.

**B. George Park, Ph.D.; Treating Psychologist**

Plaintiff began seeing psychologist George Park, Ph.D., in July 2015 because Plaintiff was extremely angry and aggressive. Plaintiff also described symptoms of anxiety, including several panic attacks a day when he was in school. Plaintiff underwent a psychiatric hospitalization at Brentwood in 2009 and again in 2012 for being extremely angry and destructive. He was diagnosed with Bipolar Disorder, ODD, Asperger's, and OCD. Dr. Park noted that Plaintiff had been taking Depakote, Abilify, and Lexapro, but that "[n]one of his medications help unless the dose is greatly increased and they always seem to stop working." Tr. 608.

Dr. Park's notes indicate that Plaintiff has a learning disability and reads at a third-grade level. Plaintiff was unable to get into trade school, and he scored too low to earn a GED. During his first examination with Dr. Park, Plaintiff was compliant with medication but still appeared to be angry, distracted, and anxious. Tr. 609. Dr. Park started Plaintiff on Lithium. Tr. 610.

In December 2015, Dr. Park noted that Plaintiff went with his grandmother to California and "reported having a good time." Plaintiff stated at that counseling session that he had not displayed anger or impulsive behaviors, and his mood was more stable. Tr. 596. At his very next counseling session in January 2016, despite continuing to be compliant with his medication, Plaintiff's condition worsened. He was "angry and verbally out of control." His mood was more unstable, he had exhibited impulsive behavior, and had outbursts of anger. Tr. 593.

At the next several sessions, Plaintiff's mood was more stable, and he was compliant with his medication. Tr. 581-587. However, he did not attend his May 2016 session. His mother and grandmother came to see Dr. Park instead, and they reported that Plaintiff had not been compliant with his medication. They said that he was, "out of control" and physically aggressive, and his ability to make decisions was impaired. They discussed possibly having Plaintiff's mother contact law enforcement to have him hospitalized but did not follow through with that plan. Tr. 576, 579.

In August 2016, Plaintiff was once again compliant with his medication. He said that his mood was less unstable, but his relationships within his family were difficult. He was irritable, mildly depressed, and showed signs of anxiety. Tr. 570.

In September 2016, Plaintiff was having no benefits from his medication. He noted depressed mood, irritability, outbursts, and impulsive behaviors. Dr. Park prescribed Wellbutrin. Tr. 567. Plaintiff was compliant with this medication for the next several months. Tr. 55-567. He did not report any side effects from this medication. Tr. 564. His mood and behavior were stable, and he reported having fewer abrupt changes in mood. Tr. 564, 560. On one occasion, He did report having outbursts, expressions of anger, and impulsive behaviors. Tr. 562, 558. Dr. Park also noted that he appeared angry and disheveled. Tr. 562. Dr. Park continued to diagnose him with "Bipolar affective disorder, current episode manic without psychotic features, severe (Active)" and "Attention-deficit hyperactivity disorder, combined type (Active)." Tr. 558, 560,562, 564.

The most recent progress note from Dr. Park is dated January 26, 2017. Plaintiff was still taking Wellbutrin and was compliant with his medication. He reported having a less depressed mood, but he had been irritable. Dr. Park noted that Plaintiff had no signs of anxiety, and his attention span was normal. Plaintiff reported being irritable at times, but this was "reduced somewhat." He continued to have outbursts or expressions of anger. He also had impulsive behaviors, but they were less frequent. Dr. Park and Plaintiff discussed increasing the Wellbutrin because it had been helpful. Tr. 556.

Dr. Park submitted a Medical Source Statement, which the ALJ afforded little weight when making her findings. The statement instructions asked Dr. Park to rate Plaintiff's ability with respect to eight categories, on a scale of poor/none, fair, good, or unlimited. The form defined poor/none as, "Unable to perform the named function in regular competitive employment & in a sheltered work setting." Fair was defined as "only

able to perform in a sheltered work setting where special considerations, accommodations & attention are provided."

Dr. Park found Plaintiff's ability to perform was poor/none in seven of the eight categories: (1) maintain regular attendance and be punctual within customary tolerance, (2) work in coordination with or proximity to others without being unduly distracted by them (3) accept instructions and respond appropriately to criticism from supervisors, (4) get along with peers without unduly distracting them of exhibiting behavioral extremes, (5) complete a normal workday and workweek without interruptions from psychologically-based symptoms, (6) complete tasks within the ordinary demands of the workplace, and within customary tolerances, and (7) withstand the stress of the ordinary work day. Plaintiff's ability to respond appropriately to changes in a routine work setting was the only category that Dr. Park marked as "fair." Tr. 522.

Dr. Park wrote on the statement that there had been "some non-compliance with medication, which is not uncommon among bipolar patients." He explained that many of the medications have unpleasant side effects, which is a "major factor in noncompliance." And when mania emerges, the patient's judgment becomes impaired and there may be little to no desire to treat the mania, which "inevitably leads to severe disruption in all areas of functioning." Tr. 523.

### C. Claimant's Function Report

With the help of his mother, Plaintiff filled out an Adult Function Report. The report states that his mother or grandmother must make him bathe. If left on his own, he will sometimes go one or two weeks without bathing. He will not change his clothes to wash

them unless made to by his mother or grandmother. He can only perform one chore per day and must have the help of an adult to keep him on task. He has a dog, but his mother or grandmother must feed the dog and let it outside because Plaintiff forgets. He cannot drive because he is too inattentive, which has caused him to wreck two vehicles. He travels by walking, and someone has to be with him. The report noted that he "liked to work on things but can't do that anymore." For example, he tried to repair a lawn mower but had to quit because he got upset.

### D. David Lanzillotti, LPC

Counselor Lanzillotti, who treated Plaintiff for adjustment disorder, submitted a Treating Source Statement for Plaintiff. The ALJ afforded this statement "no weight" in making her findings because, as an LPC, Counselor Lanzillotti was "not an acceptable medical source." Counseler Lanzillotti stated that Plaintiff was unable to cope with the stress of daily living and hard poor ability to think, reason, and respond. He wrote that Plaintiff stays at home most days, spend time with friends, and likes working on his vehicle. He noted that Plaintiff "enagages in chronic argumentation with mother and others." He listed Plaintiff's prognosis for recovery as poor. Counselor Lanzillotti opined that Plaintiff could not remember, comprehend, or carry out simple or complex instructions on an independent basis, and he would be unable to respond to work pressure, supervision, or coworkers.

### E. Robert L. Krenek, Jr., Ph.D.; Consultative Examination Report

Dr. Krenek performed an assessment of Plaintiff based on one examination of Plaintiff, plus a review of Dr. Park's treatment records and a school system's pupil

appraisal report. Tr. 615. The ALJ afforded Krenek's assessment "great weight" in making her findings. Dr. Krenek's summary noted that, during the interview, Plaintiff's thinking was "intact, logical and coherent." He found that Plaintiff's concentration ranged from the borderline range to adequate. Plaintiff's "[p]ersistence was inconsistent, as he did not appear to give his best effort" during testing. He also felt that Plaintiff appeared to intentionally respond slowly. He stated that Plaintiff's communication skills appeared generally adequate, but Plaintiff's daily living and socialization skills appeared "somewhat deficient." Dr. Krenek also found that Plaintiff appeared to be functioning in the borderline to low average range of overall intellectual abilities, although Plaintiff's school records indicated that he was in the average range.

Dr. Krenek opined that, based on assessment data, Plaintiff "should be able to perform at least low-level unskilled job tasks in a normal, competitive work environment" and that Plaintiff "should be able to understand and remember simple instructions, carry out simple instructions, and make judgments on simple work-related decisions." However, he noted that Plaintiff "may be limited due to physical health problems." Tr. 619.

**Analysis**

Plaintiff's first two issues on appeal complain of the little weight the ALJ afforded the opinion of treating psychologist Dr. Park and the great weight afforded the opinion of one-time examiner Dr. Krenek. The relative weight afforded those opinions is important because they provide important evidence relevant to the ALJ's finding that Plaintiff had the RFC to perform light work except that he could have only occasional contact with supervisors, coworkers, and the public, and he was limited to unskilled work that could be

learned on the job in a short period of time. Being able to have only occasional contact with supervisors, coworkers, and the public means from very little up to one third of the time and would generally total no more than about two hours of an eight-hour work day. Social Security Disability Law & Procedure in Federal Court § 3:57.

Ordinarily, the opinions, diagnoses, and medical evidence of a treating medical source who is familiar with the claimant's medical history and treatments, and responses to treatment, should be accorded considerable weight in determining disability. Greenspan v. Shalala, 38 F.3d 232, 237 (5th Cir. 1994). But opinions from examining medical sources must be considered, and they are generally afforded more weight than the opinion of a source who has not examined the claimant. Kneeland v. Berryhill, 850 F.3d 749, 760 (5th Cir. 2017).

A treating medical source's opinion does not necessarily govern. When good cause is shown, less weight, little weight, or even no weight may be given to the treating source's testimony or opinion. Kneeland, 850 F.3d at 760. But an ALJ cannot reject a conflicting medical opinion without an explanation. Id. at 760-61. Mere "cursory, boilerplate language about carefully considering the entire record does not constitute an explanation for rejecting a medical opinion." Id. at 761.

The ALJ summarized Dr. Park's statement and findings and stated that she afforded the opinion of the treating psychologist "little weight." Her explanation was: "When compliant, the claimant denies side effects from medications and reports a stable mood and improved interactions with others." Tr. 71. The ALJ also summarized Dr. Krenek's report and elected to afford the one-time examiner's opinion great weight, "as Dr. Krenek

personally evaluated the claimant, his findings are consistent with the claimant's reported activities of daily living, and it is consistent with recent mental status examinations performed by Dr. Park that show improved mood and overall functioning with medication compliance." Tr. 72.

 Dr. Park's treatment records include an early observation that none of Plaintiff's medications had seemed to help unless the dose was greatly increased, and they always seemed to stop working. Dr. Park adjusted his medications over the following years and, even when Plaintiff was noted to be compliant, his condition at times worsened. He was observed to be unstable with impulsive behavior and outbursts of anger during one of those periods. There were times when Plaintiff was compliant and stable, but he was also later said to be "out of control" and not compliant with his medication. At other times, he was noted to be having no benefits from his medication. No matter whether Plaintiff was compliant or not, he continually experienced outbursts or expressions of anger, sometimes to the point where physical violence was involved and contacting law enforcement was considered. Plaintiff's grandmother testified that Plaintiff was often noncompliant, and he had to rely on his family or girlfriend to give him his medicine, but the girlfriend would sometimes forget.

 The ALJ discounted Dr. Park's opinion because she found that when Plaintiff was compliant with his medications, he had a stable mood and improved interactions with others. Among her stated reasons for affording great weight to Dr. Krenek's opinion was that his findings were consistent with Dr. Park's reports that allegedly showed improvement with medication compliance. The record, however, does not support the

conclusion that Plaintiff could consistently interact up to one third of the day with coworkers, supervisors, and the public even if he is compliant with his medication. The treatment records and testimony reflect frequent problems that would interfere with that ability even when Plaintiff was reported to be compliant.

Critical to the compliance issue, Dr. Park wrote on his source statement that there had been some noncompliance, which was not uncommon among bipolar patients. If a claimant does not follow prescribed treatment without a good reason, he will not be found disabled. 20 C.F.R. § 416.930(b). Courts have found that noncompliance that is the result of a mental impairment may be a justifiable excuse. Brashears v. Apfel, 73 F. Supp. 2d 648, 651 (W.D. La. 1999). "[P]eople with serious psychiatric problems are often incapable of taking their prescribed medications consistently." Martinez v. Astrue, 630 F.3d 693, 697 (7th Cir. 2011). The Seventh Circuit found in Martinez that an ALJ erred in not taking into account the effect that the mental illness had on the claimant's ability to remain compliant with her medication. Id. See also Thomas v. Commissioner, 2016 WL 5346952, n. 31 (M.D. La. 2016) (noting that the ALJ's RFC was based on adherence to a treatment plan but did not consider or address the claimant's ability to comply with a treatment program; and collecting similar cases that found error.)

An ALJ is not required to give controlling weight to a treating source's opinion when there is competing first-hand medical evidence. Heck v. Colvin, 674 Fed. Appx. 411, 415 (5th Cir. 2017). But the reasons given to discount the treating source's findings and opinion must be supported by the record. The ALJ relied heavily on a determination that Plaintiff could meet the demands of the RFC if compliant with his medication. The

record, however, indicates that Plaintiff has serious difficulties interacting with others even when he is compliant with his medication, and his treating psychologist noted that noncompliance is to be expected given the nature of his illness. Based on the reasons given by the ALJ, which must govern the court's review, the undersigned cannot find that the decision is supported by substantial evidence. Reversal and remand are appropriate. On remand, the Commissioner may further examine the extent to which compliance would allow interaction with others and the extent to which noncompliance is due to the mental health conditions or other reasons that might not constitute good cause. Given this conclusion, the court need not analyze the third issue raised by Plaintiff on appeal.

Accordingly,

It is recommended that the Commissioner's decision to deny benefits be reversed and, pursuant to sentence four of 42 U.S.C. §405(g), this case be remanded to the Commissioner for further proceedings.

## Objections

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have fourteen (14) days from service of this report and recommendation to file specific, written objections with the Clerk of Court, unless an extension of time is granted under Fed. R. Civ. P. 6(b). A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof. Counsel are directed to furnish a courtesy copy of any objections or responses to the District Judge at the time of filing.

A party's failure to file written objections to the proposed findings, conclusions and recommendation set forth above, within 14 days after being served with a copy, shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court. See Douglass v. U.S.A.A., 79 F.3d 1415 (5th Cir. 1996) (en banc).

THUS DONE AND SIGNED in Shreveport, Louisiana, this 3rd day of September, 2019.

_____
Mark L. Hornsby
U.S. Magistrate Judge